**Federal Defenders**
OF NEW YORK, INC.

Southern District
52 Duane Street-10th Floor, New York, NY 10007
Tel: (212) 417-8700 Fax: (212) 571-0392

David E. Patton
*Executive Director*

*Southern District of New York*
Jennifer L. Brown
*Attorney-in-Charge*

December 1, 2022

**BY ECF**

Honorable Richard M. Berman
United States District Judge
Southern District of New York
New York, New York 10007

Re:   <u>United States v. Xavier Chalas</u>
        **22 Cr. 167 (RMB)**

Dear Judge Berman:

Xavier Chalas was in kindergarten the first time his parents realized something was wrong. After receiving his first mental health diagnosis at six years old, the remainder of Mr. Chalas' life has similarly followed suit. In the past twenty years, Mr. Chalas has had numerous mental health related emergency room visits and two extended psychiatric hospitalizations all before the age of 25. Indeed, Mr. Chalas' mental health issues have remained inadequately addressed and continue to remain so while at the BOP. Unfortunately, his mental health challenges have only been exacerbated by his intellectual disabilities, the severe physical abuse he experienced at the hands of his father, and his repeated homelessness throughout his teenage years. Mr. Chalas' 2019 diagnosis for Brugada syndrome – a rare heart condition – only added further heartaches and setbacks to Mr. Chalas' already challenging life. Thus, when Mr. Chalas found himself arrested in the instant case for possessing ammunition after he was shot twice in the leg by a group of armed men that attempted to rob him, he realized that he needed to change the course of his life.

As with other challenges he has faced, Mr. Chalas has reflected deeply about the factors that brought him to where he is today. He is committed to working through his mental health challenges so he can become a productive member of society and be a present parent for his one-year-old daughter. For the reasons set forth more fully below, including his mental health issues, his intellectual disabilities, his medical issues, the nature of the offense, and the supportive family that awaits him upon his release from the dire conditions of confinement he has survived in BOP custody, I respectfully request that Your Honor sentence Mr. Chalas to 366 days' imprisonment with a term of supervised release in this case.

**Background**

Xavier Chalas was born on May 29, 1997 in New York, NY to Joel Chalas and Leilana Almeida. Mr. Chalas' father and mother were eighteen and seventeen years old, respectively,

1

when he was born and "did [their] best to coparent as teenagers could." Ex. B at 1. Although Mr. Chalas' parents did not stay together long after his birth, they nonetheless maintained a good coparenting relationship and both parents remained an active part of Mr. Chalas' life.

Mr. Chalas lived with his mother throughout early childhood. As she describes, it was in Kindergarten when it became apparent to her "that [Mr. Chalas] was different or had problems." Ex. B at 1. When he was approximately six years old, Mr. Chalas received his first diagnosis: attention hyperactivity disorder (ADHD). The diagnoses only continued from there. Indeed, at seven years old, he received his first psychiatric services and at just nine years old he had a psychiatric emergency room visit for suicidal ideation. At eleven years old, Mr. Chalas' mother brought him to Four Winds for his first psychiatric hospitalization as he was suspended multiple times from school and was exhibiting mood swings. Mr. Chalas remained at Four Winds from January to March 2008 where he received multiple diagnosis: ADHD, attention deficit disorder (ADD), bipolar, and schizophrenia. He was also given a variety of psychiatric medications to manage the symptoms, such as Concerta and Tenex for ADHD and ADD as well as Abilify and Thorazine – anti-psychotic medications. The medications, however, had a negative impact on Mr. Chalas, causing him to feel tired all of the time and "drugged up." Due to the side effects, it made medicinal compliance challenging for Mr. Chalas.

Not long after this 2008 hospitalization, his mother decided to move to Florida and brought Mr. Chalas with her. As she soon realized, however, Florida did not have the schools and learning accommodations that Mr. Chalas required, leading him to return to New York to live with his father and grandmother. Ex. B at 1. While Mr. Chalas overall had a good upbringing with a loving and structured life with his mother, the opposite was true when he moved in with his father.

Mr. Chalas experienced various forms of physical and emotional abuse at the hands of his father, leading to numerous ACS investigations. For example, Mr. Chalas' father would regularly beat him with extension cords, belts, dumbbells, and other household items. His father would also have him kneel on raw rice for extended periods of time as he seemed to believe this would address Mr. Chalas' misbehavior at school. Neighbors took notice of the abuse Mr. Chalas experienced and called the police on at least one occasion when they reported hearing screaming and crying coming from Mr. Chalas' apartment. When the police arrived, they observed welts on Mr. Chalas' face, back, chest, and legs. After taking him to the hospital, Mr. Chalas was removed from his father's home and sent to live with his godmother where he had a more stability.

Less than two years later, Mr. Chalas returned to his father's custody. While initially the environment at home had improved, the abuse began not long after his return. Mr. Chalas, who was now a bit older, would fight back when his father would attempt his abuse tactics. As a result, his father would grow increasingly frustrated and kick Mr. Chalas out of the home for weeks and sometimes months at a time. Mr. Chalas was, thus, rendered homeless as a teenager, sleeping on park benches and train stations. Other times, he would be fortunate enough to find shelter with friends. It was during these years that Mr. Chalas resorted to petty theft to sustain himself.

During these years in his father's care, when he was approximately fifteen years old, Mr. Chalas was hospitalized again at Four Winds. This time, Mr. Chalas was referred by his outpatient mental health therapist as Mr. Chalas was having behavioral issues, school suspensions, and

multiple emergency room visits. It was during his second admission that Mr. Chalas received a diagnosis for Mood Disorder and Oppositional Defiant Disorder (ODD).

Soon thereafter, Mr. Chalas returned to Florida to be with his mother and attend high school. Unfortunately, with the lack of specialized services, Mr. Chalas was quickly expelled from school after having an altercation with the principal and getting sent to the psychiatric emergency room. Not long after, Mr. Chalas returned to New York to live with his grandmother and father, who fortunately no longer physically abused Mr. Chalas.

When he was 17 years old, Mr. Chalas received his first criminal conviction for criminal contempt in the second degree – a now sealed youthful offender adjudication. In the following two and a half years, Mr. Chalas would cycle in and out of the criminal legal system – many for youthful offender adjudications and virtually all connected to his unmanaged mental health.

In addition to the issues Mr. Chalas was already facing, in 2019, Mr. Chalas was diagnosed with Brugada Syndrome – "a rare, but potentially life-threatening heart rhythm disorder." Mayo Clinic, Brugada Syndrome, available at https://www.mayoclinic.org/diseases-conditions/brugada-syndrome/symptoms-causes/syc-20370489. It was then, at 22 years old, that Mr. Chalas had a defibrillator and pacemaker installed.

Although Mr. Chalas' life has mostly been a struggle, in 2021, he experienced great joy and purpose for himself upon the birth of his daughter, Zyanna Chalas, who is now one. Indeed, Mr. Chalas enjoys being a father, continues to maintain contact with his daughter and her mother while incarcerated, and looks forward to his release when he can reunite with her.

### **Mental Health and Cognitive Function Evaluation**

In light of Mr. Chalas' traumatic life experiences and mental health history, it became clear to our office that a psychological evaluation was necessary. Accordingly, our office retained a psychologist, Dr. Edward Fernandez, to better understand Mr. Chalas' mental health and cognitive functioning and provide potential treatment recommendations. Dr. Fernandez conducted his evaluation over the course of several months, culminating in a 9-page psychological report. Mr. Chalas' intellectual functioning was assessed using the Wechsler Adult Intelligence Scale–4th Edition (WAIS-IV), and he achieved a Full-Scale IQ (FSIQ) of 75, placing him in the borderline range of intellectual functioning. See Ex. C.

According to Dr. Fernandez, Mr. Chalas "has a long history of experiencing symptoms associated with mania and depression associated with Bipolar I Disorder." Ex. C at 7. As Dr. Fernandez explains, "manic episodes are characterized by clinically significant elevated, expansive, or irritable mood that is present most of the day, nearly every day, during a 1-week period" that can include "engagement in activities with potential for painful consequences." Id. After reviewing Mr. Chalas' records, Dr. Fernandez concludes that "Mr. Chalas appears to have been suffering from a mood disorder beginning in childhood which did not receive appropriate follow up treatment to mitigate the impact of the severity of his mood liability." Id. Indeed, despite presenting "with a long history of a psychiatric disorder which is further complicated by borderline intellectual functioning and the experience of childhood abuse and home instability,"

Mr. Chalas did not have adequate treatment. Ex. C at 7-8. As Dr. Fernandez explains, "Mr. Chalas did not have consistent access to evidence based treatment for a bipolar disorder including consistent adherence to psychiatric medication, psychoeducation and, during childhood, family focused therapy." Ex. C at 8.

Compounding his bipolar disorder, Mr. Chalas also "presents with deficits in intellectual functions, including reasoning, problem solving, planning, abstract thinking, and judgement dating back to early adulthood." Ex. C at 8. In addition to these deficits, intellectual disability also impacts a person social circle and inhibit their abilities to develop and maintain friendships. Id. As such, "[t]he desire to have a social network may lead some people to be befriended by and become unwitting accomplices of criminals." Id. More, "[i]ntellectual disabilities can contribute to having difficulty understanding other's motives and may not fully comprehend the implications of their behavior." Id.

With respect to treatment recommendations, Dr. Fernandez concluded that Mr. Chalas would be best served by connecting with the New York State Office for People with Developmental Disabilities (OPWDD). There, Mr. Chalas would receive "a variety of necessary services, including support finding employment and other meaningful activities in which to participate, assistance with care management, and building relationships within the community." Ex. C at 8. Additionally, this environment would "ensure Mr. Chalas partakes in necessary mental health treatment to address his symptomology," including psychotherapy and medication management. Id. In conjunction with that, Dr. Fernandez recommends that Mr. Chalas "would benefit from a full psychiatric evaluation, including testing, to provide further insight into his functioning." Ex. C at 3. Moreover, Dr. Fernandez determined that vocational training would be helpful for Mr. Chalas as it would support him in his efforts towards "becoming more independent in the community." Ex. C at 9. Ultimately, Dr. Fernandez observed that "Mr. Chalas presented as genuine with motivation to pursue an alternative lifestyle that would allow him to remain present in his child's life as well as become increasingly independent." Id. Accordingly, Dr. Fernandez concluded that "with a combination of psychiatric medication, psychotherapy, and vocational training," Mr. Chalas "would begin to have the opportunity to continue to build motivation to adhere to treatment." Id.

### Instant Offense

As set forth in the complaint, the instant arrest was the product of an investigation into Mr. Chalas for the unauthorized possession of ammunition, in violation of 18 U.S.C. § 922(g)(1). On November 1, 2021, Mr. Chalas was the victim of an armed robbery inside a building in New York County. When the officers arrived, they found Mr. Chalas shot twice in the left leg and "lying face down on the sidewalk." Complaint at p. 2. Mr. Chalas was then immediately transported to the hospital. There, upon conducting an inventory of his belongings, the officers discovered a magazine containing 9mm ammunition in Mr. Chalas' pants pocket. Four months later, in March 2022, Mr. Chalas was arrested for possessing ammunition on the date he was robbed at gunpoint and shot.

As Mr. Chalas explains in his letter, he accepts full responsibility for his actions, is deeply remorseful, and understands the seriousness of his conduct:

4

> I am writing today to express my deepest apologies and to take full
> responsibility for my actions. There's not a day that passes by that
> I don't regret them. My actions were dangerous and careless and
> selfish.

Ex. A. He deeply regrets the lack of judgment he showed through his misconduct. He recognizes that he has disappointed his family and undermined his ability to serve as a role model and parent for his daughter. Altogether, Mr. Chalas counts this experience as the worst in his life.

**The Most Appropriate Sentence:**
**366 Days' Incarceration Followed by Supervised Release**

Mr. Chalas is scheduled to be sentenced on December 20, 2022 after he pleaded guilty to one count of Felon in Possession of Ammunition in violation of 18 U.S.C. § 922(g). Section 3553(a) of Title 18 of the United States Code mandates that the Court impose a sentence "sufficient, but not greater than necessary" to achieve the goals of retribution, deterrence and rehabilitation. Using the Sentencing Guidelines as a starting point, the Court must then consider each of the factors set forth in Section 3553(a) to make an individualized sentencing determination. See, e.g., Gall v. United States, 552 U.S. 38, 59 (2007).

Probation calculates an advisory Guidelines range of 77 to 96 months, based on an offense level of 21 and a criminal history category of VI, and, pursuant to this Court's rules, does not make a recommendation as to variance or departure. While the parties agree as to Probation's Guidelines calculation, the defense respectfully requests that the Court depart from the Guidelines because Mr. Chalas' "criminal history category substantially over-represents the seriousness of [his] criminal history." U.S.S.G. § 4A1.3(b).

### I.  The Court Should Grant a Departure Pursuant to U.S.S.G. § 4A1.3(b).

Under U.S.S.G. § 4A1.3(b), a downward departure "may" be warranted if "the defendant's criminal history category substantially over-represents the seriousness of [his] criminal history." The Court should do so here.

Mr. Chalas is in criminal history category VI in part because he has 6 points from four youthful offender adjudications from when he was 18 years old. PSR ¶¶ 43–72. Mr. Chalas served a three-month sentence of imprisonment for one of the convictions and received time served on the other three convictions he received that same day as a single sentence, totaling four criminal history points. Id. Similarly, Mr. Chalas received two points for a prior youthful adjudication where he received a sentence of one year. These two sentences substantially overstate the seriousness of his criminal history and the Court should depart "horizontally." United States v. Mishoe, 241 F.3d 214, 217 (2d Cir. 2001) (a "horizontal departure" is where a district court moves horizontally across the Sentencing Table to determine a different starting Guidelines range due to an overstated criminal history). Indeed, these youthful offenses are not considered convictions and are sealed under New York law. N.Y. CRIM. PROC. LAW § 720.35(1) & (2) ("A youthful offender adjudication is not a judgment of conviction for a crime or any other offense[, and] all official records and papers . . . relating to a case involving a youth who has been adjudicated a youthful

offender, are confidential and may not be made available to any person or public or private agency."). To place Mr. Chalas in criminal history category VI because of these priors is unjust and wrong.

Currently, the Court may legally count all of these convictions in calculating Mr. Chalas' Guidelines. In the early 2000s, the Second Circuit published a series of cases allowing youthful offender convictions to count in various areas of Guidelines calculations. See, e.g., United States v. Driskell, 277 F.3d 150, 151 (2d Cir. 2002) (holding that district courts may count youthful offender convictions in calculating a defendant's criminal history); United States v. Reinoso, 350 F.3d 51, 54 (2d Cir. 2003) (holding that New York youthful offender adjudications may be considered in calculating a base offense level); United States v. Jones, 415 F.3d 256, 263–64 (2d Cir. 2005) (holding that New York youthful offender adjudications may be considered for purposes of the career offender guideline). However, given advances in the scientific understanding of adolescent brain development and New York's passing of "raise the age" legislation, which took children out of adult court, it is ripe for the Circuit to review these decisions anew. The defense objects to these youthful offender convictions counting in the Guideline calculation in this case. See, e.g., Miller v. Florida, 567 U.S. 460 (2012) (holding mandatory sentence of life without parole for juvenile convicted of homicide violates Eighth Amendment); U.S.S.G. § 5H1.1 (2020) (allowing Courts to depart due to a defendant's young age); N.Y. Courts, Raise the Age.[1] More recently, in United States v. Sellers, 784 F.3d 876, 887 (2d Cir. 2015), the Circuit held that youthful offender convictions may not be counted as a predicate offense for an Armed Career Criminal Act ("ACCA") conviction. The Circuit should go forward and set aside all New York youthful offender convictions from Guideline enhancements, especially given that youthful offender defendants are told explicitly that these cases are sealed and do not count as felony convictions.

If the Court is not inclined to set aside these convictions in calculating Mr. Chalas' Guidelines, it should follow the example the District Court took in Jones, supra—it counted the youthful offender convictions in its Guideline calculation, but then sua sponte granted a horizontal departure pursuant to U.S.S.G. § 4A1.3(b). Jones, 415 F.3d at 259. Given that: 1) 16 of Mr. Chalas' 17 points are from offenses he committed when he was in his teens; 2) he received youthful offender treatment for five of those cases (totaling six points), i.e., they are not convictions and are now sealed under New York law; and 3) the sentences for all, but one of the youthful offender adjudications were run concurrent—meaning he served one sentence for four of the offenses, the defense respectfully requests the Court horizontally depart to criminal history category V. Criminal history category V would eliminate the youthful offender adjudications (six points) from the guidelines calculation, which is the proper and just result.

Should the Court accept the defense's arguments, the Guideline calculation would be 70 to 87 months. See U.S.S.G. Chapter 5, pt. A. We submit that this range is the fair starting point for the Court's Section 3553(a) analysis. See Gall v. United States, 552 U.S. 38, 49 (2007) ("[T]he Guidelines should be the starting point and the initial benchmark.").

Regardless of the starting point, however, the Court should vary to a sentence of 366 days.

---

[1] Available at https://www.nycourts.gov/courthelp/Criminal/RTA.shtml (last visited Dec. 1, 2022).

## II. After Considering the Section 3553(a) Factors, the Court Should Sentence Mr. Chalas to 366 Days of Incarceration.

### A. Mr. Chalas' traumatic life circumstances & cognitive and emotional deficiencies are reasons to impose a sentence of time served.

As described in detail above, Mr. Chalas' life has been rife with trauma, abandonment, and setbacks. This history is a reason to grant a variance to time served. See 18 U.S.C. § 3553(a)(1). Mr. Chalas' mental health interventions since early childhood, the physical abuse he experienced, and his history of homelessness since his teenage years should be considered when fashioning an appropriate sentence.

Even more critical than his life circumstances are Mr. Chalas' cognitive limitations. In Atkins v. Virginia, 536 U.S. 304, 316 (2002), the Supreme held that "impaired intellectual functioning is inherently mitigation" not that "our society views mentally retarded offenders as categorically less culpable than the average criminal." Tennard v. Dretke, 542 U.S. 274, 287 (2004). This makes good policy sense. People with intellectual disabilities "by definition . . . have diminished capacities to understand and process information, to communicate, to abstract from mistakes and learn from experience, to engage in logical reasoning, to control impulses, and to understand the reactions of others" and thus "they, bear [diminished . . . personal culpability." Atkins, 536 U.S. at 318.

According to Dr. Fernandez's report, Mr. Chalas is intellectually and emotionally disabled. With a full-scale IQ of 75, Mr. Chalas is in the borderline range of intellectual functioning. Ex. C. Indeed, at the age of 18, Mr. Chalas had a second grade reading level. This score coupled with Dr. Fernandez's observations during the evaluations has caused Dr. Fernandez to recommend connection with the Office of People with Developmental Disabilities and treatment for Mr. Chalas' mental health symptoms.

Mr. Chalas' cognitive disability and mental health issues warrant a significant variance. See United States v. Selassie Sinclair, 21 Cr. 52 (S.D.N.Y. Sept. 15, 2022) (sentencing defendant to a term of probation, where he served no time in jail, for three armed Hobbs Act robberies where the defendant had cognitive impairment). Not only does this diagnosis mitigate his culpability, but it also sheds light on the further trauma and abuse Mr. Chalas would likely suffer if imprisoned. At the very least, imprisonment would deprive him of the necessary resources and support he needs to address these issues.

### B. Mr. Chalas' need for medical and mental health treatment militate in favor of a short sentence.

Mr. Chalas' need for treatment is another reason to grant a substantial variance. 18 U.S.C. § 3553(a)(2)(d). Mr. Chalas has yet to receive adequate medical or mental health treatment in the MDC. These circumstances will undoubtedly continue for the foreseeable future. Indeed, even where this Court ordered the MDC to provide physical therapy to Mr. Chalas due to his leg injury as a result of the shooting, and the prosecution intervened to assist Mr. Chalas in obtaining that treatment, the MDC has still failed to do so. Nor has the defense received any information

from the MDC with respect to any evaluations of Mr. Chalas' heart condition. In the time that Mr. Chalas has been detained at MDC-Brooklyn, his defibrillator was triggered, it shocked him, and he fainted. During one of those fainting spells, he hit his head on a metal bar. Our office consulted with a physician as a result of these incidents, who informed us that Mr. Chalas needs to be brought to the emergency room whenever his defibrillator is triggered as that means that his heart has stopped functioning and the equipment needs to be interrogated. As it stands, the defense has not received any information from the MDC confirming that Mr. Chalas' defibrillator has been interrogated and that he has been further examined. Mr. Chalas simply cannot remain in BOP custody with this incredibly rare condition as he will continue not to receive proper and necessary medical care.

Similarly, the BOP is not equipped to treat Mr. Chalas' mental health issues. As Dr. Fernandez notes, Mr. Chalas needs a full psychiatric evaluation, including testing, which Mr. Chalas has yet to receive despite his long history of mental illness. Rather than punish Mr. Chalas with a lengthy sentence during which he cannot receive treatment, a sentence of 366 days will sufficiently punish Mr. Chalas and allow him to transition back into the community to complete specialized mental health treatment.

Dr. Fernandez recommends a holistic approach to Mr. Chalas' care, including psychotherapy, vocational rehabilitation, and mental health counseling. Ex. C. Mr. Chalas is invested in these suggestions and recognizes them as critical to making lasting changes. Mr. Chalas was not receiving any treatment at the time of this offense. With strict supervision by the Probation Office and a thoughtful approach to his psychiatric care, Mr. Chalas will be able to have the tools necessary to succeed.

### C. Mr. Chalas' young age warrants a downward variance

At the time of the instant offense, Mr. Chalas was 24 years old. Moreover, as described in more detail above, of the 17 points afforded to Mr. Chalas in computing his Criminal History score, 16 of those points were for crimes committed when he was 19 years of age or younger. As such, the current Guidelines range is inappropriately harsh as it fails to consider Mr. Chalas' youth at the time of his current offense and prior offenses – an important consideration when fashioning a sentence.

The Supreme Court has time and again recognized "the mitigating qualities of youth" to be considered at sentencing Miller v. Alabama, 567 U.S. 460, 476 (2012) (holding that mandatory life without parole for juvenile offenders was unconstitutional in all cases) (internal quotation marks omitted). "'[Y]outh is more than a chronological fact.' It is a time of immaturity, irresponsibility, 'impetuousness[,] and recklessness.' It is a moment and 'condition of life when a person may be most susceptible to influence and to psychological damage.' And its 'signature qualities' are all 'transient.'" Id. (citations omitted). The Supreme Court noted that these conclusions rest "not only on common sense—on what 'any parent knows'—but on science and social science as well." Id. at 471.

"Recent studies on the development of the human brain conclude that the human brain development may not become complete until the age of twenty-five . . . ." Gall v. United States,

552 U.S. 38, 58 (2007) (quoting with approval lower court's sentencing determination). "The frontal lobes, homes to key components of the neural circuitry underlying 'executive functions' such as planning, working memory, and impulse control, are among the last areas of the brain to mature; they may not be fully developed until halfway through the third decade of life." Johnson, et al., Adolescent Maturity and the Brain, J. Adolescent Health 2009, available at http://www.ncbi.nlm.nih.gov/pmc/articles/PMC2892678/.

In 2014, the National Institute of Justice ("NIJ"), the research, development and evaluation agency of the U.S. Department of Justice, conducted research on juvenile and young adult offenders and concluded that "young adult offenders ages 18–24 are more similar to juveniles with respect to their offending, maturation and life circumstances." See NIJ, From Juvenile Delinquency to Young Adult Offending (2014), available at https://nij.ojp.gov/topics/articles/juvenile-delinquency-young-adult-offending. Recommendations included the establishment of "special courts for young offenders ages 18–24" and an "'immaturity discount' for young offenders that would involve a decrease in the severity of penalties, taking into account a young person's lower maturity and culpability." Id.

Because punishment and retribution relate to an offender's blameworthiness, the case for harsh punishment is not as strong with a young person as with an older adult. See Montgomery v. Louisiana, 577 U.S. 190, 207 (2016). As such, Mr. Chalas' young age at the time of the commission of the offense and his prior offenses, which have been accounted for in computing his Criminal History score as well as the base offense level, must be considered in fashioning a fair and just sentence in the instant case. Since the current Guidelines range does not account for Mr. Chalas' youth at the time of the offense or the prior offenses, a sentence below the recommended range is appropriate.

### D. Mr. Chalas' Family Situation Warrants a Downward Variance

Before he self-surrendered, Mr. Chalas was an active part of the life of his daughter. Now, Mr. Chalas awaits his release so he can return to the present father he was prior to his incarceration.

Mr. Chalas' daughter deserves her father back. Children like Zyanna experience a unique hardship when their parents are incarcerated during their developmental years. "Having a parent incarcerated is a stressful, traumatic experience of the same magnitude as abuse, domestic violence and divorce, with a potentially lasting negative impact on a child's well-being." See Annie E. Casey Foundation, A Shared Sentence: the Devastating Toll of Parental Incarceration on Kids, Families and Communities 3 (Apr. 2016).[2]

A downward variance is warranted both to allow Mr. Chalas to return to his daughter and in recognition of the fact that Mr. Chalas will be returning to a strong family unit. Even with Mr. Chalas' tumultuous past with his father, they both now enjoy a positive relationship

---

[2] Available at https://assets.aecf.org/m/resourcedoc/aecf-asharedsentence-2016.pdf

and keep in close contact. As his father explains, "[m]e and his mom have attended family group sessions together with Xavier to support his mental health." Ex. B at 3. There is no doubt that the road ahead for Mr. Chalas will be challenging no matter what; however, "he has a great supportive family who will be ready to help him upon his release." Id.

### E. Mr. Chalas' crime, while serious, does not demand additional time in prison.

Mr. Chalas' crime was serious, and he is deeply ashamed for his actions. He knows ammunition and guns are dangerous and has spent the last year regretting his actions. Ex. A. He also knows this is not his first run-in with the criminal justice system, and he recognizes the need to change. That said, given the fact that his possession of ammunition was in the context of being the victim of an armed robbery by a group of people that resulted in what may now be permanent injury to his leg, a significant variance is warranted.

Should the Court accept the defense's recommend sentence, it would not create an unwarranted sentencing disparity. See 18 U.S.C. § 3553(a)(6). In 2020, courts in this District imposed a sentence in 61 firearm cases. Table 10, U.S.S.C., Statistical Information Packet, Fiscal Year 2020. In those cases, 52.5% of defendants were sentenced below their advisory Guideline range. Id. at Table 10. As such, a sentence below the Guideline range would be completely in-line with District norms.

### F. The conditions of Mr. Chalas' confinement at the MDC warrant a downward variance.

Even before the pandemic, the MDC had long been known to be "among the worst [jails] in the federal system." Annie Correal et al., 'It's Cold As Hell': Inside a Brooklyn Jail's Weeklong Collapse, N.Y. Times, Feb. 9, 2019, available at https://www.nytimes.com/2019/02/09/nyregion/brooklyn-jail-no-heat-inmates.html. The facility has been the subject of federal civil rights probes, see, e.g., Off. Inspector Gen. U.S. Dep't Just., The September 11 Detainees 142-47 (2003), available at https://www.oig.justice.gov/reports/september-11-detainees-review-treatment-aliens-held-immigration-charges-connection (finding "a pattern of physical and verbal abuse" at the MDC), criminal prosecutions, see, e.g., United States v. Lopresti, 340 F. App'x 30 (2d Cir. 2009) (affirming the conviction of an MDC guard who conspired with other guards to grievously beat an inmate and then fabricate evidence to blame his injuries on a suicide attempt), prison rights lawsuits, see, e.g., Ord. Granting Class Certification, Scott et al., v. Quay et al., 19 Cv. 1075 (S.D.N.Y. May 25, 2021) (finding evidence of "a series of inhumane and potentially dangerous conditions" at the MDC), and judicial ire, see, e.g., Sent'g. Tr., United States v. Morgan, 19 Cr. 209 at 37 (S.D.N.Y. May 5, 2020) (Berman, J., noting: "I've personally become acutely aware of the deficiencies at . . . the MDC.").

Yet nothing in the MDC's past can compare to its brutal conditions during the COVID-19 pandemic. Courts have rightly noted that federal detainees in New York endured "terrible circumstances" throughout this pandemic. See, e.g., Sent'g. Tr. at 21, United States v. Brito, 20 Cr. 63 (S.D.N.Y. Jan. 13, 2021). Despite the pain these restrictions inflicted on detainees, however, they did little to slow the virus. In fact, Mr. Chalas tested positive for the COVID-19 virus himself. He experienced several of the virus' worst symptoms, including constant headaches, sweating,

fevers, loss of taste and smell, and body aches. Additionally, Mr. Chalas experienced chest pains during his two-week quarantine, which was particularly troubling given his already present heart issues described above. Many Americans now know how awful these symptoms can be, but few could understand the misery of suffering them at MDC. MDC simply did not have the staff necessary to care for its ill.

However, even where it appeared as though the pandemic-related lockdowns would slow down, the BOP staff shortages that followed have caused similarly inhumane conditions. Indeed, these staffing shortages have led to numerous lockdowns and dangerous living conditions due to fighting and lack of supervision.

Mr. Chalas' time at MDC warrants a significant downward variance. Many judges across this district have held the same. See, e.g., Sent'g. Tr. at 21, United States v. Brito, 20 Cr. 63 (S.D.N.Y. Jan. 13, 2021) (Gardephe, J.); Sent'g. Tr. at 17, United States v. Rodriguez, 19 Cr. 817 (S.D.N.Y. Oct. 6, 2020) (Kaplan, J.); Sent'g. Tr. at 40, United States v. Mitchell, 13 Cr. 752 (S.D.N.Y. Aug. 5, 2020) (Failla, J.); Sent'g. Tr. at 24, United States v. Diaz, 20 Cr. 305 (S.D.N.Y. Feb. 25, 2021) (Cote, J.); Sent'g. Tr. at 41, United States v. Newton, 18 Cr. 373 (S.D.N.Y. Sep. 25, 2020) (Sullivan, J.); Sent'g. Tr. at 31, United States v. Mihai, 19 Cr. 651 (S.D.N.Y. Feb. 24, 2021) (Swain, J.); Sent'g. Tr. at 24, United States v. Berber, 18 Cr. 703 (S.D.N.Y. Jun. 11, 2020) (Crotty, J.); Sent'g. Tr. at 25-26, United States v. Rivera, 16 Cr. 66 (S.D.N.Y. May 11, 2020) (Torres, J.).

The logic behind giving downward variances to defendants who have suffered pandemic-era detention is obvious -- each day they have served has been more punitive than a normal day in jail, and should therefore count for more time. See Sent'g. Tr. at 17, United States v. Gonzalez, 18 Cr. 669 (S.D.N.Y. Apr. 2, 2021) (Oetken, J., holding that pandemic-era incarceration is "the equivalent of either time and a half or two times what would ordinarily be served."); see also Sent'g. Tr. at 23-24, United States v. Garcia et al., 20 Cr. 27 (S.D.N.Y. Jul. 10, 2020) (Koeltl, J., explaining that "imprisonment contemplated by the guidelines would be imprisonment under normal circumstances, but [pandemic-era] imprisonment has been anything but normal circumstances."). Even the government has admitted that "a day spent in prison under the conditions occasioned by the pandemic is not equivalent to an ordinary such day." Gov't Sent'g Submission at 7, United States v. Garcia, 19 Cr. 593 (S.D.N.Y. Nov. 28, 2020) (citing United States v. Harris, 2020 WL 5801051, at *4 (S.D.N.Y. Sept. 29, 2020)).

A downward variance is even more justified for a defendant who contracted COVID-19 in federal custody. As the court in United States v. Aguirre-Miron, 20 Cr. 212 (S.D.N.Y. Aug. 7, 2020) explained: "I cannot ignore the fact that [Mr. Aguirre-Miron] became infected with this deadly disease while in federal custody and undoubtedly suffered enormous suffering during the period of time when he was suffering from the symptoms of the disease that has killed so many." See Sent'g. Tr. at 18-19. The Court varied downward and sentenced Mr. Aguirre-Miron to half of the bottom of his guidelines range. Id. The Court stated, "The variance is based on the fact that the defendant contracted the virus while at the MCC." Id.

A significant downward variance is similarly warranted here. At the time of this filing, Mr. Chalas has spent eight months in federal custody. As discussed above, his detention has been grueling and has been far more punitive than eight months of normal incarceration.

11

**Conclusion**

Justice would not be served by giving Mr. Chalas a lengthy term of incarceration in this case. He suffers from serious mental health issues, medical issues, intellectual disabilities, and the offense conduct in this case does not warrant a harsh sentence. Indeed, he is a young man, who has not had the necessary evaluations and treatment to ensure that his mental health is appropriately addressed.

According to Dr. Fernandez, Mr. Chalas would benefit from interventions targeted towards dynamic needs that contributed to the circumstances of his current involvement with the justice system. He stated that he would benefit from a full psychiatric evaluation and involvement in a program such as Office of People with Developmental Disabilities, which offers people with intellectual and developmental disabilities a comprehensive range of services. None of these interventions will be available to Mr. Chalas if he remains incarcerated. As such, the defense respectfully requests a sentence of 366 days.

Thank you for your consideration of this request.

Respectfully submitted,

/s/ Marisa K. Cabrera
Marisa K. Cabrera, Esq.
Assistant Federal Defender
Tel.: (212) 417-8730

Cc: AUSA Madison Smyser (via ECF)